## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICK MCCRACKEN,** | : | **CIVIL ACTION NO. 3:19-CV-1063** |
| **Administrator of the Estate of** | : | |
| **JEFFREY ALLEN MCCRACKEN,** | : | **(Chief Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **FULTON COUNTY,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Patrick McCracken commenced this civil rights action on behalf of the estate of his late father, Jeffrey Allen McCracken.  Plaintiff asserts various constitutional and state-law claims against more than four dozen state and county defendants, all arising from his father's tragic suicide while detained at Bedford County Prison in June 2017.  Before the court are plaintiff's amended complaint, motions to dismiss filed by all defendants, the report of Magistrate Judge Karoline Mehalchick, and several defense objections to that report.

## I.  Factual Background & Procedural History

The facts alleged in plaintiff's amended complaint are these.  On June 24, 2017, decedent Jeffrey Allen McCracken ("McCracken") got into an argument with his girlfriend, Keri Moore, at their home in Fulton County, Pennsylvania.  (See Doc. 17 ¶ 47).  McCracken and Moore had been having relationship problems for the past two months, and McCracken was "depressed and emotionally distraught" after the

argument.  (Id. ¶¶ 47-48).  At some point, Moore ended the conversation and went to bed.  (See id. ¶ 49).

Plaintiff alleges that around 1:00 a.m. on June 25, 2017, "McCracken called for Moore to come out of the bedroom" and then "reached for a loaded shotgun and put its barrel to his mouth in an attempt to kill himself."  (Id. ¶ 49).  Plaintiff further alleges that "Moore lunged to get the gun away from McCracken when the gun discharged and shot into the ceiling."  (Id. ¶ 50).  Moore's sister was also present at the time and attempted, unsuccessfully, to take the gun from McCracken as he left the home.  (See id.)  Moore called 911 and informed the dispatcher that McCracken "had tried to kill himself with a gun."  (Id. ¶ 51).

The dispatcher relayed this information over the radio, and Pennsylvania State Police ("PSP") Troopers Jason Pierotti and Seth Sprague were dispatched to the couple's home.  (Id. ¶¶ 52-53).  Moore and her sister informed the troopers that McCracken was suicidal.  (Id. ¶ 53).  The troopers searched for McCracken to no avail before being advised by their supervisor, PSP Corporal Ellis Barnett, to return to PSP barracks and initiate criminal charges against McCracken.  (Id.)  Trooper Pierotti asked Moore and her sister to return to PSP barracks with the troopers to provide formal statements.  (Id. ¶ 54).  At the barracks, both women reiterated that McCracken had attempted to shoot himself.  (See id.)  Trooper Pierotti prepared charges against McCracken for recklessly endangering another person, simple assault, and discharging a firearm into an occupied structure, and a warrant issued for McCracken's arrest.  (Id. ¶ 55).

At approximately 10:00 a.m., PSP Corporal Jeff Remeikas and PSP Troopers James Dountas, Chris Bourne, and Zachary Beers returned to McCracken and Moore's home, where they found and arrested McCracken. (Id. ¶ 56). After returning to PSP barracks, Trooper Dountas read McCracken his Miranda rights and McCracken relayed essentially the same version of events as Moore and her sister: that he had retrieved his shotgun and threatened to kill himself following an argument with Moore and that, when Moore tried to take the gun, it fired into the ceiling. (Id. ¶ 57).

McCracken was arraigned on the charges in Fulton County and ordered detained pending his preliminary hearing. (Id. ¶ 59). Due to overcrowding in Fulton County's jail and pursuant to a contract with neighboring Bedford County, McCracken was detained at Bedford County Prison. (Id. ¶¶ 16, 59-60). Plaintiff avers that as many as 28 different individuals may have transported McCracken from his arraignment to Bedford County Prison. (Id. ¶ 61). Specifically, he states that McCracken was transported to Bedford County Prison by:

> Fulton County Sheriff Keith Stains and/or Fulton County Deputy Sheriff John Doe # 1-5, and/or Bedford County Sheriff Charwin Reichelderfer, and/or Bedford County Deputy Sheriff John Doe #1-5, and/or Trooper Jason Pierotti, and/or Trooper Seth Sprague, and/or Corporal Ellis Barnett, and/or Trooper James Dountas, and/or Trooper Chris Bourne, and/or Corporal Jeff Reimekas, and/or Trooper Zachary Beers, and/or Trooper John Doe #s 1-8, and/or Constable Normal Sheffield.

(Id. ¶ 61). Plaintiff maintains that each of these individuals knew or should have known that McCracken was a suicide risk. (See id. ¶ 66).

The amended complaint offers little insight into what happened when McCracken arrived at Bedford County Prison.  Plaintiff avers that transporting officers "failed in their duty" to apprise prison staff that McCracken had recently attempted suicide.  (See id. ¶¶ 61-66).  Plaintiff alleges that prison medical and corrections staff—specifically, Doctor John Doe; Debra Slick, RN; Liana Altemus, RN; Katherine Barrett, RN; Todd Haskins; John/Jane Doe #1-5; Warden Troy Nelson; Correctional Officer Darrell Holliday; and Correctional Officers John Doe #1-5—knew or should have known that McCracken was at risk for suicide, although plaintiff does not reconcile this allegation with his claim that transporting officials failed to relay that information.  (See id. ¶ 68).  Plaintiff then asserts that, "despite knowing that McCracken was depressed, distraught[,] and had recently attempted suicide," medical staff marked on intake forms that McCracken was not suicidal, referred him to general population, provided no medical treatment, and did not place him on suicide watch.  (See id. ¶¶ 70-72).  Because of overcrowding issues, McCracken was "housed by himself" in the prison's gymnasium.  (Id. ¶ 71).

Sometime during his two-day detention at Bedford County Prison, McCracken called Moore.  (See id. ¶ 75).  The call was monitored by Correctional Officer Holliday "and/or" five John Doe correctional officers.  (Id.)  During the call, McCracken told Moore that he had written a suicide note and described where she could find it.  (Id.)  Neither Correctional Officer Holliday nor any of the John Doe correctional officers placed McCracken on suicide watch, referred him for psychiatric evaluation, or otherwise acted to protect him.  (Id.)

On June 27, 2017, McCracken entered the gymnasium's bathroom unsupervised and hung himself by attaching his bedsheet to the bathroom door's metal retractor.  (Id. ¶ 76).  Correctional Officer Holliday discovered McCracken at approximately 5:55 a.m.  (Id. ¶ 77).  Lifesaving measures were unsuccessful, and McCracken was pronounced dead.  (Id. ¶ 78).

Plaintiff commenced this action on behalf of McCracken's estate on June 24, 2019.  The matter is currently proceeding via plaintiff's first amended complaint.  The amended complaint names 52 defendants in total, as follows:

- The Fulton County defendants, consisting of Fulton County, the Fulton County Commissioners (Stuart Ulsh, Rodney L. McCray, and Larry R. Lynch), Sheriff Stains, and five John Doe deputy sheriffs;

- The Bedford County defendants, consisting of Bedford County, Sheriff Reichelderfer, five John Doe deputy sheriffs, Warden Nelson, Correctional Officer Holliday, and five John Doe correctional officers;

- The PSP defendants, consisting of Colonel Robert Evanchick in his capacity as Commissioner of the PSP,[1] Trooper Pierotti, Trooper Sprague, Corporal Barnett, Trooper Dountas, Trooper Bourne, Corporal Reimekas, Trooper Beers, and eight John Doe PSP troopers;

- The medical defendants, consisting of PrimeCare Medical, Inc., Doctor Doe, Todd Haskins, Nurse Slick, Nurse Altemus, Nurse Barrett, and five John Doe and Jane Doe PrimeCare Medical employees; and

- Constable Normal Sheffield.

(See generally Doc. 1).  Plaintiff asserts the following claims: in Count I, a Section 1983 claim for deliberate indifference to a known risk of suicide against all named

---

[1] Colonel Evanchick was confirmed as PSP Commissioner on June 4, 2019, and is automatically substituted as the defendant in this action.  See FED. R. CIV. P. 25(d).

defendants; in Count II, a Section 1983 claim for inadequate medical care against the medical defendants; in Count III, a Section 1983 substantive due process claim against all defendants alleged to be involved in McCracken's transport; in Count IV, a Section 1983 substantive due process claim against Correctional Officer Holliday and the John Doe correctional officers; in Count V, a claim against Fulton County and its commissioners, Bedford County, both counties' sheriffs, PrimeCare Medical, Commissioner Evanchick, and Warden Nelson for maintaining customs and policies that are deliberately indifferent to detainees' constitutional rights; in Count VI, a state-law claim for medical professional negligence against the medical defendants[2]; and in Counts VII and VIII,[3] state-law wrongful death and survival actions against all defendants.

The five groups of defendants filed separate motions to dismiss, and Judge Mehalchick issued a report recommending that we grant in part and deny in part those motions.  All parties except plaintiff and the PSP defendants have lodged objections to the report.

---

[2] Plaintiff titles this claim "Plaintiff v. PMC, DOCTOR," (Doc. 17 at 34), but the enumerated paragraphs thereafter reference all medical defendants by name, (see id. ¶¶ 146-147).  We construe the claim as being asserted against all medical defendants.

[3] The amended complaint styles both the wrongful-death count and the separate survival count as "Count VII."  (See Doc. 17 at 34-35).  For clarity, we refer to the counts sequentially: the wrongful-death count as Count VII and the survival count as Count VIII.

## II.   Legal Standards

### A.   Review of a Magistrate Judge's Report and Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court undertakes *de novo* review of the contested portions of the report. See E.E.O.C. v. City of Long Branch, 866 F.3d 93, 99 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)); see also FED. R. CIV. P. 72(b)(3).  We afford "reasoned consideration" to any uncontested portions of the report before adopting them as the decision of the court.  City of Long Branch, 866 F.3d at 100 (quoting Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987)).

### B.   Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

## III.  **Discussion**

The pending Rule 12(b)(6) motions raise a constellation of challenges to plaintiff's amended complaint, chief among them that the pleading is long on supposition and short on fact.  Defendants also raise varying immunity defenses, seek to strike certain requests for attorney's fees and punitive damages, and ask us to dismiss allegations of joint and several liability.  Judge Mehalchick recommends that we grant sovereign immunity to the PSP defendants as to plaintiff's state-law claims, dismiss plaintiff's request for punitive damages as to all defendants on the wrongful-death count and as to the municipal entities on all counts, and strike all claims of joint and several liability.  Judge Mehalchick opines that the amended

complaint otherwise adequately pleads all claims and should be allowed to proceed against all defendants.  It is this latter recommendation that is met with robust defense objections.

We begin by identifying the points on which we agree with Judge Mehalchick.  We agree that the PSP defendants are entitled to sovereign immunity as to the state-law claims asserted against them.  (See Doc. 51 at 22-24).  We also agree that the request for punitive damages must be stricken as to all defendants on the wrongful-death count and as to the municipal defendants on all counts, (id. at 27-29), and that plaintiff alleges no facts to support joint and several liability, (id. at 29-30).  There are no objections to these aspects of the report, and we perceive no clear error in Judge Mehalchick's analysis of these issues.  See FED. R. CIV. P. 72(b), advisory committee notes.  Accordingly, we will adopt these portions of Judge Mehalchick's analysis as the decision of the court.  We turn our attention to the challenged aspects of the report, beginning with the constitutional claims.[4]

---

[4] The PSP defendants have not moved to dismiss the federal constitutional claims against them.  (See Doc. 42).  The balance of our discussion pertains to the Fulton and Bedford County defendants, the medical defendants, and Constable Sheffield.  Where our analysis *infra* refers to the "transporting officers," that phrase excludes the PSP defendants.

### A.    Individual Liability Claims

Plaintiff's core claims arise under Section 1983 of Title 42 of the United States Code.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish Section 1983 liability, a plaintiff must prove a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Defendants do not dispute their status as state actors for purposes of Section 1983.  Our sole inquiry is whether any defendant engaged in conduct that deprived McCracken of rights secured by the United States Constitution.  Although plaintiff assigns different labels to each of Counts I through IV, at bottom he asserts a singular constitutional grievance: that all defendants were deliberately indifferent to McCracken's known vulnerability of suicide.[5]  (See Doc. 17 ¶¶ 89-135; see also Doc. 35 at 7-17; Doc. 40 at 11-15; Doc. 41 at 12-18; Doc. 48 at 10-15).

---

[5] Several defendants have construed plaintiff's amended complaint as also stating a state-created danger claim, presumably based on plaintiff's allegations that the defendants involved in McCracken's transport "used their authority to create an opportunity for danger that otherwise would not have existed."  (See Doc. 17 ¶¶ 110-111).  Plaintiff disclaims that construction of his pleading.  (Doc. 41 at 16; see Doc. 40 at 12-13; Doc. 48 at 14-15).  Accordingly, we do not consider a state-created danger theory of liability.

The suicide of a pretrial detainee may support a Fourteenth Amendment claim against state officials who are aware of and act with reckless indifference to a detainee's "particular vulnerability" to suicide.  The Third Circuit Court of Appeals recognized liability for such claims in Colburn v. Upper Darby Township ("Colburn I"), 838 F.2d 663 (3d Cir. 1988), and later elaborated on the applicable standard in Colburn v. Upper Darby Township ("Colburn II"), 946 F.2d 1017 (3d Cir. 1991), and Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005).  To plead a viable Section 1983 detainee-suicide claim, a plaintiff must allege facts demonstrating that (1) the detainee had a "particular vulnerability" to suicide, (2) custodial officials "knew or should have known" of that vulnerability, and (3) those officials "acted with reckless indifference" to the known risk of suicide.  Woloszyn, 396 F.3d at 319 (quoting Colburn II, 946 F.2d at 1023).

The moving defendants focus primarily on the second element.  They contend that plaintiff has failed to allege any facts to support the conclusion that each defendant knew or should have known of McCracken's particular vulnerability to suicide.  (See Doc. 24 at 11-12; Doc. 34 at 7-8; Doc. 36 at 8-10; Doc. 46 at 11-12).  As to all defendants but the correctional officers, we agree.

"Even where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood."  Colburn II, 946 F.2d at 1024.  The Third Circuit explained in Colburn II that a plaintiff need not show subjective knowledge—only that the defendant should have known that

the detainee in question was particularly vulnerable to suicide.  <u>Id.</u> at 1024-25.  The

court articulated the standard as follows:

> "[S]hould have known," as used in <u>Colburn I</u>, is a
> phrase of art with a meaning distinct from its usual
> meaning in the context of the law of torts.  *It does not
> refer to a failure to note a risk that would be perceived
> with the use of ordinary prudence.*  It connotes something
> more than a negligent failure to appreciate the risk of
> suicide presented by the particular detainee, though
> something less than subjective appreciation of that risk.
> The "strong likelihood" so of suicide must be "so obvious
> that a lay person would easily recognize the necessity for"
> preventative action; the risk of self-inflicted injury must
> be not only great, but also sufficiently apparent that a lay
> custodian's failure to appreciate it evidences an absence
> of any concern for the welfare of his or her charges.

<u>Id.</u> at 1025 (emphasis added) (internal citations omitted).

Plaintiff asserts in conclusory fashion that all 52 defendants "knew or

should have known" of the circumstances underlying McCracken's arrest and

detention.  (<u>See</u> Doc. 17 ¶¶ 61, 66, 68).  But as to nearly all moving defendants, the

amended complaint is devoid of facts to support this legal conclusion.  The most

extreme example is the Fulton County Commissioners, who are included in the

deliberate-indifference count based solely on the claim that they somehow "knew"

that McCracken was vulnerable to suicide and failed to act.  (<u>Id.</u> ¶ 90).  Yet plaintiff

does not offer a single factual allegation linking these defendants to McCracken's

arrest, transport, or detention, or explain how they otherwise should have known

that McCracken may have been suicidal.  We will dismiss plaintiff's deliberate-

indifference claim against the Fulton County Commissioners for both lack of

personal involvement and failure to plead the knowledge element.

Nor does plaintiff articulate how any of the transporting officers—other than the PSP defendants involved in McCracken's arrest—had the requisite knowledge to support deliberate-indifference liability.  Plaintiff avers that transporting officers *should* have information about the circumstances surrounding a detainee's arrest, but plaintiff does not allege that the transporting officers *did* have that information here.  (See id. ¶ 62).  There is no allegation that transporting officers had a copy of or access to the criminal complaint or other records from which they could have gleaned information about McCracken's arrest, or that they were present in court when that information may have been discussed.  Stripped of its "[t]hreadbare recitals" concerning what plaintiff thinks these defendants ought to have known, see Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555), the amended complaint fails to state a claim against the transporting officers.

The same infirmities plague plaintiff's amended complaint against the medical defendants and most correctional defendants.  As to the bulk of these defendants—*viz*., Doctor John Doe, Nurse Slick, Nurse Altemus, Nurse Barrett, someone named "Todd Haskins," five John and Jane Doe employees of PrimeCare Medical, and Warden Nelson—the amended complaint offers only a bare assertion that they "knew or should have known that McCracken had just attempted suicide, and was a serious risk of suicide."  (Id. ¶ 68).  Again, a legal conclusion without factual foundation.  We have no description of the prison's intake or screening processes from which to discern what these defendants might have learned about McCracken.  And we have no indication of what interactions, if any, the defendants

had with McCracken during those processes.  There is simply no factual basis for the conclusion that these individuals knew or should have known of McCracken's suicide attempt or then-existing suicidality.  We will thus dismiss the deliberate-indifference claims against the medical defendants and Warden Nelson.[6]

Plaintiff's related claim against the medical defendants for inadequate medical care fails for the same reason.  To prevail on a claim that prison officials were deliberately indifferent to a serious medical or mental-health need, a plaintiff must plead that detaining officials knew or should have known of, and consciously disregarded, an excessive risk to detainee health and safety.  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citation omitted); see also Woloszyn, 396 F.3d at 320-21 (citations omitted).  In the detainee-suicide context, this claim concerns alleged inadequacies in mental-health treatment leading up to the suicide and is distinct from and broader than any deliberate-indifference claim arising from the suicide itself.  Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017).  Nonetheless, the claim still requires plaintiff to allege facts demonstrating that medical staff were aware of a serious mental-health need.  Because the amended complaint contains no such facts, this claim must be dismissed as well.

We reach a different conclusion as to Correctional Officer Holliday and the five John Doe correctional officers, as to whom the amended complaint passes muster.  Plaintiff alleges that these defendants monitored one of McCracken's

---

[6] We address plaintiff's supervisory-liability claim against Warden Nelson separately, *infra*.

phone calls and overheard him talking about his suicide note and explaining to his girlfriend where in their home to find it. (Doc. 17 ¶ 75). Plaintiff further alleges that, despite this knowledge, the correctional officers took no action to ensure that McCracken was evaluated, placed on suicide watch, or otherwise protected from himself. (Id.) These allegations suffice for Rule 12(b)(6) purposes—that is, they "raise a reasonable expectation that discovery will reveal evidence" that these defendants knew or should have known of, and were deliberately indifferent to, McCracken's particular vulnerability to suicide. See Twombly, 550 U.S. at 556. We will therefore deny the Bedford County defendants' motion to dismiss as pertains to the claims against Correctional Officer Holliday and the John Doe correctional officers.[7]

---

[7] The correctional officer defendants cursorily invoke the qualified immunity defense. (See Doc. 34 at 14). Qualified immunity protects a state actor who has committed a constitutional violation if the injured party's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). No liability will attach if a reasonable actor could have believed the conduct in question was in compliance with settled law. Id.; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006). It is clearly established in this circuit that custodial officials may be liable for deliberate indifference to a detainee's known vulnerability to suicide. See Colburn I, 838 F.2d 663; Colburn II, 946 F.2d 1017; Woloszyn, 396 F.3d 314. Defendants do not dispute this point. Rather, they contend that "not following through" when they learned McCracken had written a suicide note was "at worst . . . negligence" for which they are entitled to qualified immunity. (Doc. 34 at 14). We disagree. For the reasons set forth above, we find that plaintiff has pled a plausible constitutional violation against the correctional officers and we decline to afford qualified immunity to them at this juncture.

## B.    Supervisory and Municipal Liability Claims

In Count V, plaintiff asserts a claim against Fulton County and its commissioners, Bedford County, both counties' sheriffs, PrimeCare Medical, PSP Commissioner Evanchick, and Bedford County Prison Warden Nelson.  Therein, plaintiff alleges that these defendants maintain an unconstitutional policy, custom, or practice of failing to implement suicide screening, monitoring, intervention, or treatment protocols.  (See Doc. 1 ¶ 138).  Plaintiff also alleges that these defendants have failed to train employees in suicide screening, monitoring, intervention, and treatment.  (See id. ¶ 140).  All defendants except Commissioner Evanchick move to dismiss this claim.

Municipalities and other local governments are "persons" for Section 1983 purposes, Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978), but such entities are not responsible for every constitutional tort committed by their employees, see Connick v. Thompson, 563 U.S. 51, 60 (2011).  To bring a Section 1983 claim against a municipality, a plaintiff "must show that they were deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and that the deprivation of those rights was the result of an official government policy or custom."  Mulholland v. Gov't Cty. of Berks, 706 F.3d 227, 238 (3d Cir. 2013).  The Third Circuit has explained that, for municipal liability to attach, the plaintiff must establish that the municipal policy or custom was itself unconstitutional or was the "moving force" behind the constitutional deprivation.  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted).  When a challenged policy or custom is not

facially unconstitutional, a plaintiff can meet the causation requirement "only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences"—"[a] showing of simple or even heightened negligence will not suffice." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 407 (1997)).

A plaintiff may bring a policy-based Monell claim for an alleged failure to train employees. Thomas, 749 F.3d at 222. A failure-to-train claim requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will encounter the untrained employees. See id. (quoting Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)). This standard is demanding—it requires evidence that the municipality "disregarded a known or obvious consequence" of its deficient training program. Connick, 563 U.S. at 61 (quoting Brown, 520 U.S. at 410). The alleged training deficiency must be closely related to the constitutional injury suffered by the plaintiff. Id.

Certain individual defendants, too, may be held liable on a custom-or-policy theory. The Third Circuit has explained that defendants in supervisory roles may be liable if they "established and maintained a policy, practice[,] or custom which directly caused [the] constitutional harm." Santiago, 629 F.3d at 129 n.5 (second alteration in original) (quoting A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)). To prevail on such a claim, a plaintiff must allege that the supervisory defendant is a governmental policymaker—i.e., "an official

with final policymaking authority"—who either established or enforced policies that were directly responsible for the claimed constitutional injury. <u>Chavarriaga v. N.J. Dep't of Corr.</u>, 806 F.3d 210, 223 (3d Cir. 2015) (quoting <u>Sample v. Diecks</u>, 885 F.2d 1099, 1114, 1118 (3d Cir. 1989)).

Ordinarily, a pattern of prior constitutional violations will give notice to a municipal actor that existing training or policies are constitutionally problematic, and continued adherence to the original practices will demonstrate the "conscious disregard" required to establish deliberate indifference. <u>See</u> <u>Thomas</u>, 749 F.3d at 223 (citation omitted); <u>see</u> <u>also</u> <u>Berg</u>, 219 F.3d at 276.  In rare situations, however, the need to act may be "so obvious" that failing to do so could rise to the level of deliberate indifference even without a pattern of prior violations. <u>Thomas</u>, 749 F.3d at 223 (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 n.10 (1989)); <u>see also</u> <u>Berg</u>, 219 F.3d at 276 (same).  This "single-incident" liability turns on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights." <u>Thomas</u>, 749 F.3d at 223-24 (alteration in original) (quoting <u>Brown</u>, 520 U.S. at 409).  Plaintiff does not allege a pattern of prior violations sufficient to put any municipal defendant on notice that its existing practices or policies might be constitutionally infirm. (<u>See generally</u> Doc. 17).  Presumably, plaintiff intends to proceed on a single-incident theory.

The bulk of this count fails to state a claim.  As against Fulton County, its commissioners and sheriff, and PrimeCare Medical, the absence of an underlying constitutional violation defeats a custom-or-policy theory of liability.  A supervisory

liability claim "necessarily includes as an element an actual violation at the hands of subordinates or employees." Santiago, 629 F.3d at 130.  Same for a Monell claim: municipal liability cannot lie "if there is no violation in the first place." Mulholland, 706 F.3d at 238 n.15 (citations omitted).  We held *supra* that the amended complaint fails to plead a constitutional violation attributable to any individual Fulton County or PrimeCare Medical employee.  We will thus dismiss the derivative Monell claims against Fulton County and PrimeCare Medical and the supervisory liability claims against the Fulton County Commissioners and Sheriff Stains.

Our analysis differs slightly as to Bedford County and Warden Nelson.  Because we have found that plaintiff failed to allege a constitutional violation by Sheriff Reichelderfer or the John Doe deputy sheriffs for their alleged involvement in McCracken's transport, any Monell claim against Bedford County arising from the transport fails too.  See Mulholland, 706 F.3d at 238 n.15 (citations omitted); Santiago, 629 F.3d at 130.  To the extent Count V concerns Bedford County's alleged transport-related customs or policies, we must dismiss that claim.

However, plaintiff does state a plausible custom-or-policy claim against Bedford County and Warden Nelson arising from the inactions of the correctional officers.  Specifically, we held *supra* that plaintiff has adequately pled a plausible constitutional violation as to Correctional Officer Holliday and the other unnamed correctional officers based on their alleged awareness of and deliberate indifference to McCracken's risk of suicide.  Bedford County's only challenge to this claim is that plaintiff has not identified a municipal policy, practice, or custom to support his

<u>Monell</u> claim.  (Doc. 34 at 12).  That argument, however, is refuted by the amended complaint.

Plaintiff alleges that both Bedford County and Warden Nelson have long maintained a custom or policy of failing to provide adequate screening, monitoring, intervention, or treatment of potentially suicidal detainees, and that both the county and the warden failed to train correctional officers to recognize or respond to signs of suicidality.  (Doc. 17 ¶¶ 138, 140).  What is more, plaintiff claims that defendants' failure to implement such procedures was a conscious choice motivated, at least in part, by a "desire to save money."  (<u>Id.</u> ¶ 139).  Whether these allegations are true is not for us to decide; that will be borne out in discovery.  For our purposes at this Rule 12(b)(6) stage, plaintiff has sufficiently stated a claim for an unconstitutional policy or custom against Bedford County and Warden Nelson arising from alleged deliberate indifference to McCracken's known risk of suicide during his detention.

## C.      State-Law Claims

Plaintiff asserts three state-law claims: a medical professional negligence claim in Count VI against the medical defendants, and statutory wrongful-death and survival claims against all defendants in Counts VII and VIII, respectively.  We take up each of these claims, and the defendants' challenges to them, below.

### 1.      *Medical Professional Negligence*

The Pennsylvania Supreme Court has articulated four elements for a medical professional negligence claim: to prevail, a plaintiff must establish that (1) the defendant owed a duty to the patient, (2) the defendant breached that duty,

(3) the defendant's breach was "the proximate cause of, or a substantial factor in," the patient's harm, and (4) damages suffered by the patient "were a direct result of that harm." Thierfelder v. Wolfert, 52 A.3d 1251, 1264 (Pa. 2012) (quoting Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990)). The existence and scope of a defendant's duty turns, in part, on "the nature of the risk imposed and foreseeability of the harm incurred." Id. at 1275 (quoting Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000)). The ultimate question in medical professional negligence cases is whether the defendant's conduct "fell below the standard of care" owed to the patient. Id. at 1264 (quoting Brannan v. Lankenau Hosp., 417 A.2d 196, 199 (Pa. 1980)).

Plaintiff's negligence claim against the medical defendants is based on the same allegations underlying his Section 1983 claims: he contends that these defendants knew of and disregarded McCracken's vulnerability to suicide and thus fell short of their duties as medical professionals. (See Doc. 17 ¶¶ 145-148). The sum total of plaintiff's allegations are that the medical defendants "had a duty to comply with generally accepted medical standards of care in their treatment of . . . McCracken," that they "violated their duty of care," and that this violation was "a direct and proximate cause and substantial factor in bringing about" McCracken's death. (Id.) The problem, once again, is that the amended complaint offers no facts to support these sweeping conclusions. Accordingly, we must dismiss plaintiff's medical professional negligence claims against the medical defendants.

### 2. *Wrongful Death and Survival*

Plaintiff asserts claims against all defendants under Pennsylvania's wrongful-death and survival statutes.  See 42 PA. CONS. STAT. §§ 8301, 8302.  These statutes do not create independent causes of action; rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent.  See id.; see also Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (quoting Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936)).  In other words, where no underlying tort has been pled, there can be no wrongful-death or survival action.  See Kaczorowski, 184 A. at 664; Pisano, 77 A.3d at 660; see also Moyer v. Rubright, 651 A.2d 1139, 1143 & n.3 (Pa. Super. Ct. 1994).  Plaintiff acknowledges that these claims are derivative of, and rise and fall with, his Section 1983 and common-law medical professional negligence claims.  (See Doc. 48 at 16; see also Doc. 17 at 35, 36).  Consequently, we will dismiss the wrongful-death and survival counts as to all defendants except the correctional officer defendants, Bedford County, and Warden Nelson.

### D. Leave to Amend

Courts must generally grant leave to amend before dismissing a civil rights claim if a curative amendment is conceivable.  Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  Except for the legal defects identified by Judge Mehalchick and not challenged by plaintiff, the deficiencies identified in this memorandum are factual rather than legal in nature.  Curable amendment is conceivable as to the constitutional and common-law claims against the Fulton

County defendants, Sheriff Reichelderfer, the Bedford County John Doe deputy sheriffs, the medical defendants, and Constable Sheffield.  Therefore, while we will dismiss the claims against these defendants pursuant to Rule 12(b)(6), we will do so without prejudice and with leave to amend.

Lastly, we address the issue of placeholder defendants which, based on the analysis above, are winnowed to five John Doe correctional officers at Bedford County Prison.  Unnamed John and Jane Doe defendants may be allowed to stand in for the party they represent "until discovery permits the intended defendants to be installed."  Francis v. Northumberland County, 636 F. Supp. 2d 368, 398 (M.D. Pa. 2009) (quoting Johnson v. City of Erie, 834 F. Supp. 873, 878 (W.D. Pa. 1993)). The Bedford County defendants suggest that plaintiff has impermissibly "rendered a descriptive class [of correctional officers] without any specifics."  (Doc. 34 at 16-17).  We disagree since, as explained above, the universe of potential defendants to be substituted is quite limited: the claim pertains only to those correctional officers who monitored McCracken's phone call to his girlfriend and overheard McCracken describe the existence and location of a suicide note in their home.  We emphasize that nothing in this opinion shall preclude these John Doe defendants from filing an appropriate motion to dismiss once they are named, and we encourage plaintiff to identify the John Doe defendants by name as soon as discovery allows.

## IV.    <u>**Conclusion**</u>

For all of the above reasons, we will grant in part and deny in part the

pending motions to dismiss.  An appropriate order shall issue.


<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:    May 28, 2020